IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA    )
                            )
            v.              )        1:16CR442-1
                            )
JUAN ANTONIO HUNTER         )


**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, Chief District Judge.

This case is before the court on remand from the Fourth Circuit on the court's prior order denying Defendant Juan Antonio Hunter's motion for compassionate release. (Doc. 68.) Hunter, proceeding *pro se*, has filed an amended supplemental motion for compassionate release. (Doc. 75.) The Government has responded and leaves the determination as to whether Hunter is an appropriate candidate for compassionate release to the court; however, "the [G]overnment reaffirms its position in its initial response that the § 3553(a) factors generally militate against early release for Hunter." (Doc. 78 at 13.)

On April 19, the court ordered the Government to file any updated medical records for Hunter to provide the most up-to-date information as to his condition. (Doc. 80.) The Government did so (Doc. 82) and filed an explanatory response (Doc. 83). Hunter has filed a reply. (Doc. 84.) The medical professionals' most current assessment of Hunter's medical condition is thus before

the court. After careful consideration and for the reasons set forth below, Hunter's motion will be denied without prejudice.

## I.   BACKGROUND

In December 2017, pursuant to a guilty plea, Hunter was convicted of one count of possession of a stolen firearm in violation of 18 U.S.C. § 922(j). (Doc. 25.) On March 14, 2018, this court sentenced Hunter to the statutory maximum of 120 months of imprisonment and three years of supervised release. (Doc. 34.) Hunter is currently incarcerated at Terre Haute USP and has an expected release date of August 18, 2026. (Doc. 65 at 4.)

Hunter initially moved for compassionate release based on his many health conditions, including a dissecting aortic aneurysm, hypertension, acute kidney injury, hypoxia, and stage three kidney disease. (Doc. 61 at 2-4.) He argued that his conditions made him particularly susceptible to severe illness should he contract the COVID-19 virus. (Id. at 4.) This court assumed, without deciding, that Hunter's conditions posed an extraordinary and compelling circumstance warranting his compassionate release, but it denied his motion after carefully analyzing the § 3553(a) factors. (Doc. 68 at 9.) Of note, at the time Hunter had refused to be vaccinated against COVID-19, and the court found that his lengthy criminal history and infractions while incarcerated advised against his release. (Id. at 8.)

Hunter then appealed. In an unpublished per curiam opinion,

2

the Fourth Circuit vacated the court's denial of Hunter's compassionate release motion and remanded the case. United States v. Hunter, No. 21-7424, 2022 WL 385542 (4th Cir. Feb. 8, 2022). The Fourth Circuit identified two issues for the court to address on remand: the extent to which Hunter's health conditions, principally his aortic dissection, mitigate any future danger to the public given that the dissection occurred after he committed violent acts both inside and outside prison, and Hunter's argument that he is susceptible to COVID-19, particularly now that he has received the COVID-19 vaccine after this court's denial of his motion for compassionate release. Id. at *1.

Hunter has since filed an amended supplemental motion for compassionate release. (Doc. 75.) He renews his arguments related to his aortic dissection and a claimed particular vulnerability to COVID-19. (Id. at 2.) The Government, although resting the ultimate determination with the court, argues that Hunter's aortic dissection "does not appear, at present, to substantially diminish his ability to function" and urges that "the § 3553(a) factors generally militate against early release." (Doc. 78 at 13.)

## II.  ANALYSIS

"Federal law has long authorized courts to reduce sentences of federal prisoners facing extraordinary health conditions," but prior to the passage of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, district courts could grant such

3

reductions only upon a motion by the Director of the Bureau of Prisons ("BOP") under 18 U.S.C. § 3582(c)(1). United States v. Beck, 425 F. Supp. 3d 573, 577-78 (M.D.N.C. 2019). However, Congress amended § 3582(c)(1) when it passed the First Step Act. Pertinent here, the First Step Act added a provision to § 3582(c)(1) that allows a defendant to bring a motion for compassionate release directly in a district court after either "the defendant has fully exhausted all administrative rights to appeal a failure of the BOP to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

Once the exhaustion requirement is met, a defendant must either (1) have "extraordinary and compelling reasons" for a compassionate release, or (2) be at least 70 years old, have served 30 years in prison, and have the Director of the BOP determine that the defendant is not a danger to the public. Id. Additionally, a court, in considering a reduction in sentence pursuant to § 3582(c)(1)(A), must consult the sentencing factors set forth in 18 U.S.C. § 3553(a) and may grant the reduction only if it is "consistent with [the] applicable policy statements" issued by the United States Sentencing Commission. Id. Of note is United States Sentencing Guideline § 1B1.13. Section 1B1.13 essentially reiterates the requirements of § 3582(c)(1)(A), with

4

the additional requirement that a defendant not be "a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2); see also Beck, 425 F. Supp. 3d at 578. The application notes to § 1B1.13 provide examples of extraordinary and compelling reasons to grant a compassionate release, including when an inmate is suffering from a debilitating medical condition that has "substantially diminishe[d] the ability of the inmate to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover." U.S.S.G. § 1B1.13 application note 1(a)(ii).

For over three years, the Sentencing Commission has lacked a quorum and thus has not updated its policy statements on compassionate release since the First Step Act was signed into law in December 2018. United States v. McCoy, 981 F.3d 271, 282 n.6 (4th Cir. 2020). Thus, the current phrasing of §1B1.13 addresses scenarios in which the BOP Director files a motion for compassionate release, but not situations in which an inmate files a similar motion under § 3582. As the language of § 1B1.13 limits its application to motions filed by the BOP Director, the Fourth Circuit has held that "§ 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." Id. at 282. Accordingly, it has stated that "district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling

5

reasons' for a sentence reduction." Id. at 283. However, courts may consider § 1B1.13 as helpful guidance when considering a motion filed by an inmate. Id. at 282 n.7.

Hunter argues that his medical conditions, particularly his aortic dissection, combined with the COVID-19 pandemic, establish extraordinary and compelling reasons for his early release. (Doc. 75 at 2.) It is true that "the COVID-19 outbreak is unprecedented and poses a heightened risk to those in this nation's prisons and jails." United States v. Carver, 451 F. Supp. 3d 1198, 1199 (E.D. Wash. 2020). With that risk in mind, "the Attorney General has directed the Bureau of Prisons, when assessing compassionate release applications, to prioritize the transfer of incarcerated inmates to home confinement 'where appropriate' to decrease the risks to their health." United States v. Resnick, 451 F. Supp. 3d 262, 267 (S.D.N.Y. 2020) (quoting Memorandum for Director of Bureau Prisons from the Attorney General, Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic (Mar. 26, 2020), accessed at https://www.justice.gov/file/1262731/download). Although "it is prudent to consider the factors that the Attorney General finds to be important," the memorandum "has no binding force on the Judiciary." Id. at 268. Many of the factors identified by the Attorney General are similar to the factors in 18 U.S.C. § 3553(a) and U.S.S.G. § 1B1.13 that the court considers here.

6

Hunter's aortic dissection is surely a serious cardiovascular condition.  According to the Mayo Clinic, an aortic dissection is a tear in the inner layer of the body's main artery.  See Aortic Dissection, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/aortic-dissection/symptoms-causes/syc-20369496#:~:text=An%20aortic%20dissection%20is%20a,aortic%20dissection%20is%20often%20deadly (last accessed May 16, 2022).  When the aortic wall splits, blood begins to divert into the torn wall, causing the inner and middle layers of the aorta to dissect further.  If the blood goes through the outside aortic wall, aortic dissection is often deadly.

However, whether a dissection is severe depends on the type and extent of the dissection.  There are two types of aortic dissection, type A and type B.  Of the two, a type A dissection is "more dangerous than type B dissections because it is more likely to cause the aorta to rupture leading to a potentially fatal heart condition."  Types of Aortic Dissection, New York Univ. Langone Health, https://nyulangone.org/conditions/aortic-dissection-in-adults/types (last accessed May 16, 2022).  "Most type B aortic dissections are chronic and therefore rarely cause[] life-threatening side effects.  Usual treatments include medication and routine checkups with [one's] doctor."  Id.

The most current medical records indicate that Hunter has a stable "type B aortic dissection" that begins "just distal to the

7

left subclavian artery." (Doc. 79 at 6, 55.) The CDC does not specifically address this condition. Rather, it notes that those with "heart conditions such as failure, coronary artery disease, cardiomyopathies, and possibly high blood pressure" increase your risk of serious illness should they contract COVID-19. See People with Certain Medical Conditions, CDC https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated May 2, 2022).

The medical records make clear that Hunter's dissection remains in an observational and monitoring phase. In December 2021, the CT exam showed "dilatation of the proximal descending thoracic aorta from 3.2 cm to 3.6 cm in 6 months." (Doc. 79 at 56.) While this represented "fairly rapid growth," the doctor noted that the "aorta overall is still small in size." (Id.) Thus, the recommendation was "to continue close CT surveillance." (Id.) Indeed, a January 13, 2022 record characterized his Type B aortic dissection as "stable." (Doc. 79 at 6.)

In accordance with the medical advice, Hunter has received consistent and frequent medical care both from the BOP as well as outside medical providers at Indiana University Health. Hunter's aortic dissection appears to be well-managed by the BOP and has not severely restricted his ambulatory activity. Even Hunter himself acknowledges in his briefing, "Mr. Hunter's medical

8

condition is serious but controlled to the extent that it does not appear to be imminently life threatening." (Doc. 75 at 2.)

As of March 16, 2022, Hunter's medical providers list him as having a history of "aortic dissection with aneurysmal dilatation that is being followed by CT surgery." (Doc. 79 at 1.) Based on this court's inquiry, the Government filed the most current medical records and clarified that this means that Hunter's condition is being monitored regularly by cardiothoracic surgeons and that no surgery has been deemed appropriate yet. (Doc. 83.) Furthermore, the BOP attorney represented to the Government that Hunter's medical provider "assesses his current prognosis as good," that his condition "is regularly reviewed by a cardiovascular surgeon as well as cardiology," and currently "his condition is considered to present no risk of imminent death." (Id. at 2.) Hunter argues in reply that his condition "is one of sudden arrival and [can] cause sudden death if not responded to appropriately." (Doc. 84 at 2.) While this appears to describe a Type A aneurysm rather than the Type B he has, consistent with the treatment by the medical professionals, BOP officials note that "[i]f an imminent risk of death were present, surgery would have already been performed." (Doc. 83 at 2.)

Hunter has also received medical advice adjusting his medications at regular intervals with the goal of controlling his hypertension. The medications appear to be working well, with

medical providers noting that as of December 9, 2021, Hunter's blood pressure "readings have been stable." (Doc. 79 at 10.) Additionally, Hunter has been able to engage in exercise, including more intense exercise than that advised by his medical providers. For instance, in October 2021, his medical provider wrote that he had been "working out a little bit. Jogging and burpees. States swelling has went [sic] down." (Id. at 18.) However, his medical provider continued to caution Hunter to "not over exert" himself while working out because it "[c]ould cause [the] dissection to get bigger." (Id.) Hunter now contends that he "has not been exercising." (Doc. 84 at 2.) Whether or not this is true, it is clear that his doctors only caution against heavy lifting in excess of fifty pounds and "heavy exercise," and in fact encourage light exercise. (Doc. 79 at 10, 12-13.) While Hunter's dissection is a potentially serious condition, it has not prevented him from engaging in more intense forms of exercise than recommended by his medical providers.

Furthermore, Hunter's conduct is inconsistent with his representations that his medical conditions have led him to alter his conduct. For example, Hunter cites his hypertension as a risk factor for Covid-19 co-morbidity, but at a December 7, 2021 visit, he was listed as "non-compliant" with taking clonidine, an antihypertensive medication to reduce his blood pressure, having missed 46 of his prescribed 90 doses. (Id. at 10.) This, despite

10

his providers' recommendation to him that he comply "to prevent worsening of aortic dissection and death." (Id. at 12.)

Hunter also continues to purchase "low nutritional value foods and drinks" from the commissary despite medical advice warning him that these items could worsen his aortic dissection. (Id. at 10.) He responds by arguing that his "dietary choices that he purchased from the commissary are the product of the limited selection of food items the FBOP Policy allows commissaries to sell." (Doc. 84 at 2.) He contends that "[h]ad there been a better selection of whole foods . . . he would have elected to buy those items to eat more health consciously." (Id.) However, this too is belied by his medical records. On January 19, 2022, BOP health service staff modified Hunter's diet and requested that he be placed on the heart-healthy diet offered by the BOP. (Doc. 79 at 36.) But as late as April 14, 2022, Hunter's doctors wrote, "[t]he patient was very argumentative today so much so that it disrupted the clinical interview . . . [and] at least 4 times if not more mentioned 'his lawyers' in a threatening manner." (Doc. 82 at 1.) The doctors concluded that Hunter "was not conducive to" medical advice that he follow a heart-healthy diet and remained argumentative. (Id. at 3.) On the surface, therefore, Hunter's continued resistance toward the advice of his medical providers is inconsistent with his characterizations of his condition and is some evidence that he does not regard his medical condition to be

11

serious enough to alter his behavior.

The record therefore presents significant evidence that Hunter's condition is well managed by the BOP, and Hunter himself acknowledges that his condition is not imminently life threatening. Although the Government ultimately does not take a position as to whether Hunter has demonstrated extraordinary and compelling reasons, it points out that his condition is not analogous to the few other compassionate release cases where the defendant suffered an aortic dissection. For instance, in United States v. Maxwell, the defendant, a non-violent drug offender, suffered an aortic dissection alongside a spinal cord stroke which left him "completely unable to care for himself." --- F. Supp. 3d ----, 2021 WL 4776012, at *6 (S.D. Ohio 2021). Maxwell was unable to sit or stand for more than 10-15 minutes, could not bathe or dress himself, and required a full-time caretaker. Id. at *7. Here, by contrast, Hunter is able to care for himself and remains ambulatory. Likewise, Hunter's case is not comparable to that of the defendant in United States v. Sullivan, who moved for compassionate release after having open-heart surgery for an aortic dissection prior to incarceration, had a stroke soon thereafter, and filed his motion at the height of the COVID-19 pandemic when the virus was "not well under control." No. 18 CR 503-2, 2020 WL 5630508, at *1 (N.D. Ill. Sept. 21, 2020). Responding to these cases, Hunter writes "[c]ase authorities may

12

share a common thread under the rules of law, however they can not serve and the garantees [sic] of fate amiss a very extreme medical condition that can suddenly cause death." (Doc. 84 at 3.)

Beyond these two cases, the Government notes two other cases in which the defendant had an aortic dissection. (Doc. 78 at 12.) In both, the court denied compassionate release where each defendant was recovering from surgery to address the aortic dissection, had either previously recovered from COVID-19 or was in a facility with no confirmed cases, and all other medical conditions were well-managed with medication. See United States v. Williams, No. 2:16-cr-169-2, 2021 WL 1099596 (S.D. Ohio Mar. 23, 2021); United States v. Harden, No. 4:11-CR-127(8), 2020 WL 4287266 (E.D. Tex. July 26, 2020). No party has provided, nor is the court aware of, any other case addressing compassionate release for a defendant with an aortic dissection.

In its initial order, this court assumed, without deciding, that Hunter's aortic condition qualified as an extraordinary and compelling reason and turned its attention to the § 3553(a) factors. (Doc. 68 at 5.) However, based on the more up-to-date medical records since that time, it is apparent that Hunter's Type-B aortic aneurysm, while a potentially serious condition, is relatively stable and chronic. By no measure is it currently life-threatening, as is the case with a Type A aneurysm. Hunter continues to receive treatment, he is regularly and closely

13

monitored by cardiothoracic surgeons and specialists, he has access to medications which appear to be regulating his other health conditions, he has received counseling and diet plans from his medical providers, he remains ambulatory, and there is no indication that he lacks the ability to care for himself as a result of the dissection. The court therefore concludes that Hunter's <u>present</u> medical condition is not an extraordinary and compelling circumstance warranting his release.

On remand, the Fourth Circuit noted that the district court should "thoroughly assess Hunter's argument concerning his particular susceptibility to serious illness should he contract COVID-19." <u>Hunter</u>, 2022 WL 385542 at *1. Although the court noted that his refusal was not controlling in the court's ruling, Hunter had theretofore refused the COVID-19 vaccine. (Doc. 68 at 5.) He has since received the Johnson & Johnson vaccine on September 27, 2021. (Doc. 79 at 43, 73.) While the CDC recommends recipients of the Johnson & Johnson vaccine obtain a booster shot within two months of vaccination and there is no evidence Hunter has done so, the Johnson & Johnson vaccine is effective at mitigating the risk of COVID-19 infection. The CDC indicates that Johnson & Johnson's vaccine was 66.3% effective at preventing COVID-19 infection during clinical trials. <u>See</u> CDC, <u>Johnson & Johnson's Janssen</u> <u>COVID-19 Vaccine Overview and Safety</u>, <u>https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-</u>

vaccines/janssen.html (last updated Apr. 27, 2022). His
protection may have waned in the months since vaccination, but
research shows that he vaccine provides some level of continued
effectiveness against hospitalization afterwards. See Daniel R.
Feikin et. al, Duration of Effectiveness of vaccines against SARS-
CoV-2 infection and COVID-19 disease: results of a systematic
review and meta-regression, 399 The Lancet 924 (Mar. 5, 2022)
(https://www.thelancet.com/journals/lancet/article/PIIS0140-
6736(22)00152-0/fulltext) (last accessed May 12, 2022).

Additionally, USP Terre Haute, where Hunter is currently
housed, reports no active COVID-19 infections among staff or
inmates. See COVID-19 Cases, Federal Bureau of Prisons,
https://www.bop.gov/coronavirus/ (last accessed May 16, 2022.
Consistent with other courts nationwide, to the extent Hunter rests
his motion on a fear of contracting COVID-19, even considering his
comorbidities, the court finds his vaccination status as well as
the fact that there are no active cases of COVID-19 at USP Terre
Haute as mitigating his risk of contracting COVID-19 to such a
degree that the presence of COVID-19 is not an extraordinary and
compelling circumstance warranting his release. See, e.g., United
States v. Thomas, Nos. 21-1645 & 21-2105, 2022 WL 296594, at *2
(3d Cir. Feb. 1, 2022); United States v. Brown, No. 7:13-CR-44-
FL-1, 2021 WL 2481676, at *2 (E.D.N.C. June 17, 2021) ("[T]he court
agrees with the growing consensus of district courts that, in

15

general, defendants who have received a highly effective COVID-19 vaccine cannot establish extraordinary and compelling reasons for release based on concerns about contracting COVID-19."); United States v. Wilcox, No. 16-20821, 2021 WL 2986321, at *4 (E.D. Mich. July 15, 2021) ("[B]ecause Wilcox received a vaccine and is held in a facility with no active cases, his case does not present an extraordinary or compelling reason for his release."); United States v. West, No. 3:17-CR-00075-JO-3, 2021 WL 1785077, at *3 (D. Or. May 5, 2021) ("West's recent vaccination mitigates his risk from COVID-19 to such an extent that COVID-19, in combination with West's underlying medical conditions, no longer presents an extraordinary and compelling reason to grant compassionate release."); United States v. Johnson, No. 2:14-CR-00127-ALM-12, 2021 WL 3173346, at *3 (S.D. Ohio July 27, 2021) (acknowledging scientific consensus regarding vaccine efficacy and denying compassionate release to vaccinated defendant); see also United States v. Courville, No. CR 17-482-TUC-CKJ, 2021 WL 3192847, at *3 (D. Ariz. July 28, 2021) (denying compassionate release despite Delta variant); United States v. Bolden, No. CR13-201-RSM, 2021 WL 3269636, at *5 (W.D. Wash. July 30, 2021) (same); United States v. Cruz-Valera, No. 8:17-CR-201-T-27AEP, 2021 WL 3111645, at *1 (M.D. Fla. July 22, 2021) (same).

Even were the court to conclude that Hunter had an extraordinary and compelling circumstance, the court would

similarly deny his motion in light of the § 3553(a) factors. Section 3553(a) requires a court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the statutory purposes of sentencing. 18 U.S.C. § 3553(a). The court must consider -—

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence[s] and the sentencing range established for [the applicable offense category as set forth in the guidelines] . . .;
>
> (5) any pertinent policy statement . . . by the Sentencing Commission . . .;
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

Id. In its denial of Hunter's motion for compassionate release,

17

this court agreed with the Government, noting that the § 3553(a) factors advised against Hunter's compassionate release. (Doc. 68 at 6-9.) This was particularly true where Hunter had a significant criminal history and during his time of incarceration he collected at least four disciplinary sanctions. (Id.)

On remand, the Fourth Circuit noted that this court "failed to acknowledge that Hunter's violent conduct both inside and outside of prison . . . occurred before he suffered the aortic dissection." Hunter, 2022 WL 385542, at *1. It is true that the court did not make explicit this distinction when it noted "[w]hile Hunter's medical condition is serious, it is indisputable that he still presents a substantial risk to the community given his extensive criminal history and his conduct while incarcerated." (Doc. 68 at 8-9.) To be sure, the court was of course aware of the actual record. In any event, this distinction does not cause the court to alter its immediate decision in the exercise of its discretion.

Hunter's underlying offense in this case -- trading illegal drugs for illegal firearms -- required no strenuous exertion of energy on his part. (Doc. 31 at ¶¶ 15, 18-20.) The buyer of the narcotics had placed a gun outside his home and called Hunter to pick it up. (Id. at ¶ 15.) The following morning, Hunter phoned the buyer, informed him he had retrieved the firearm, and left $60 in cocaine base by a tree where the firearm was placed. (Id.)

18

Moreover, Hunter's supplier knew him for years as a result of Hunter's drug trafficking, which also requires no heavy lifting or exertion. (Id. at ¶ 6.) No aspect of this crime required strenuous physical activity which could now be impacted by Hunter's aortic dissection.

A review of Hunter's criminal history reflects additional crimes which would not be inhibited, at least physically, by his current medical condition. While Hunter was 31 years old at sentencing, his criminal history dates back to age 18 and includes two convictions for felony possession of cocaine with intent to distribute (sentenced to 8-10 months and 15-18 months, consecutive on revocation; 13-25 months sentence), a conviction for hit and run failure to stop for damaged property, assault on a female for hitting her in the side of the head and spraying air freshener in her eyes, child abuse for striking a child in the face, and two additional convictions of felony possession of cocaine with intent to distribute and felony conspiracy to sell cocaine. (Id. at ¶¶ 47-59.) None of these criminal acts required any more physical exertion than that which Hunter has applied exercising while incarcerated. If Hunter can engage in light exercise (indeed his doctors encourage it (Doc. 79-13)), as well as jog and do burpees, he is not precluded from engaging in relatively passive crimes such as distributing drugs, engaging in illegal firearm transactions, or striking someone once in the face and spraying

19

air freshener in their eyes. At best, some of Hunter's prior criminal activity, such as assault on a government official for striking police officers and ripping their clothing, or his separate assault on a female for assaulting a woman "by ripping her clothing off, dragging her through a yard, and scratching her face," might be impacted by his current condition. (Id. at ¶¶ 56-57.) However, many of his prior criminal activities, including the offense of conviction, could easily be committed even with an aortic dissection.

The same is true for Hunter's infractions while incarcerated. He has received at least four disciplinary sanctions for serious violations including phone abuse, introduction of drugs or alcohol into the prison, threatening bodily harm, and fighting with other inmates. (Doc. 65-6.) While one can argue that his ability to fight with other inmates may be impacted by his health conditions, Hunter's other infractions could still be committed by someone with an ailment as serious as an aortic dissection. The fact that Hunter has attempted to introduce synthetic drugs into the prison as recently as October 2019 indicates that he maintains some willingness to participate in drug transactions. (Id.) His aortic dissection, while serious, does not complicate his ability to engage in illegal drug transactions to the extent that he no longer poses a danger to the public. As such, the court determines that, although Hunter's extensive criminal history and his infractions

while incarcerated occurred prior to his aortic dissection, his current physical ability is sufficient to enable him to engage in dangerous criminal conduct.

Furthermore, releasing Hunter after serving only half of his sentence would insufficiently recognize the seriousness of his offense conduct. Hunter's presentence report details at length how Hunter rode around trading narcotics for stolen firearms. (Doc. 31 at ¶¶ 10-15.) In addition to the AR-15 Hunter possessed when arrested, despite being a convicted felon at the time, the presentence report lists seven other firearms connected to him, including one which was used at a shooting at a Charlotte mall. (Id. at ¶ 15 & n. 3.) It is precisely this kind of conduct that puts firearms into the hands of prohibited criminals and makes society more dangerous.

What the court is left with, then, is surmising that now that Hunter has a potentially serious medical condition ahead of him, he has committed to abandoning his criminal ways sufficiently to reduce any risk to the community. While one would hope so, the record does not support that conclusion. Indeed, as recently as April 14, 2022, Hunter became abusive, disruptive, and threatening with his treating physicians to the point that it not only interfered with the treating physician's ability to conduct a clinical interview but caused the doctor to find it "concerning for the security risks" it posed to him. (Doc. 82 at 1, 4.) This

court in its discretion concludes that Hunter has not demonstrated that the 3553(a) factors tilt in his favor.

Having fully considered the ¶ 3553(a) factors, Hunter's motion for compassionate release is therefore denied.[1]

Additionally, to the extent Hunter asks for his sentence to be reduced to something less than his current sentence, but more than time served, the court will deny the motion without prejudice. Rather than decide now whether a sentence reduction is appropriate, the court concludes it is better to deny the motion without prejudice to a renewed motion at a later point in time, when Hunter has served a more substantial portion of his sentence, or if his health conditions become more severe to warrant it, or he has some other basis for release. See United States v. Hancock, No. 06-CR-206-2, 2021 WL 848708, at *4-6 (M.D.N.C. Mar. 5, 2021), aff'd, No. 21-7393 (4th Cir. Mar. 1, 2022) (denying compassionate release motion to reduce defendant's § 924(c) stacked sentences without prejudice).

---

[1] Given the court's finding that Hunter's early release would be inappropriate for the reasons discussed, it is unnecessary to consider whether his release plan would suffice. See 28 C.F.R. § 571.61(a)(2) (requiring a detailed release plan for compassionate release requests). However, the court does note that Hunter's stated release plan of starting a Facebook business to "educate male U.S. Citizens aged 38 to 45 in the history of the 'superpredator'" and engage with creators, artists, and celebrities to "solicit their products at a contingency rate of 40 percent," while living with his wife, Jessica Simon, raises concerns. (Doc. 75 at 8.) This is particularly true where Simon was involved in Hunter's underlying offense of trading stolen firearms for illegal narcotics. (Doc. 31 at ¶ 18.)

## III. CONCLUSION

Having carefully considered the complete record before the court, after directing the parties to supplement it with the most current medical records for Hunter, and having carefully considered the issues raised by the Court of Appeals and all the arguments raised by the Defendant,

IT IS THEREFORE ORDERED that Hunter's motion and renewed motion for compassionate release (Docs. 61, 75) are DENIED without prejudice.

                                   /s/   Thomas D. Schroeder
                              United States District Judge

May 16, 2022