IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA )
)
v. ) 1:16-CR-442
)
JUAN ANTONIO HUNTER )

**MEMORANDUM ORDER**

Before the court is pro se Defendant Juan Antonio Hunter's second motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). (Doc. 98.) The Government has responded in opposition (Doc. 103), and Hunter has replied (Doc. 105) and moved for leave to amend (Doc. 107). Hunter's motion to amend will be granted, and the court has considered the supplementary material in this order. For the reasons set forth below, the motion for compassionate release will be denied.

I.   BACKGROUND

In December 2017, pursuant to a guilty plea, Hunter was convicted of one count of possession of a stolen firearm in violation of 18 U.S.C. § 922(j). (Doc. 25.) On March 14, 2018, this court sentenced Hunter to the statutory maximum of 120 months of imprisonment and three years of supervised release. (Doc. 34.) Hunter has served approximately 6 years of his 10-year sentence, and his presumptive release date is October 11, 2026. Fed. Bureau of Prisons, Find an Inmate, at https://www.bop.gov/inmateloc. He is just shy of 37 years old. Id.

Hunter initially moved for compassionate release on July 20, 2021, based on several health conditions, including a dissecting aortic aneurysm, hypertension, acute kidney injury, hypoxia, and stage three kidney disease. (Doc. 61 at 2-4.) He argued that his conditions made him particularly susceptible to severe illness should he contract the COVID-19 virus. (Id. at 4.) This court assumed, without deciding, that Hunter's conditions posed an extraordinary and compelling circumstance warranting his compassionate release, but it denied his motion after carefully analyzing the § 3553(a) factors. (Doc. 68 at 9.)

Upon appeal of that order, the Fourth Circuit vacated and remanded, identifying two issues for the court to address: the extent to which Hunter's health conditions, principally his aortic aneurysm, mitigate any future danger to the public given that the dissection occurred after he committed violent acts both inside and outside prison, and Hunter's argument that he is susceptible to COVID-19, particularly now that he has received the COVID-19 vaccine after this court's denial of his motion for compassionate release. United States v. Hunter, No. 21-7424, 2022 WL 385542, at *1 (4th Cir. Feb. 8, 2022) (per curiam).

On remand, this court ordered an update of Hunter's medical records and further assessed his argument that his medical condition presented an extraordinary and compelling reason for compassionate release. (Doc. 85 at 6-14 (considering Hunter's

2

medical record at length).)  With the benefit of more medical records than at the time of its initial denial, the court determined that "Hunter's present medical condition is not an extraordinary and compelling circumstance warranting his release." (Id. at 14 (emphasis in original).)  In addition, the court found that the section 3553(a) factors weighed heavily against early release, particularly in light of the fact that two months after the Fourth Circuit's remand decision, Hunter became abusive, disruptive, and threatening to the very physician treating him to the point that it not only interfered with the physician's ability to conduct a clinical interview but caused the doctor to find it "concerning for the security risks" it posed to him.  (Id. at 18.) Hunter did not appeal that decision.

On March 24, 2023, Hunter filed the present successive motion for compassionate release, arguing that he would be subject to a shorter sentence if sentenced today, that he is suffering from serious medical conditions, and that the section 3553(a) factors weigh in favor of early release.  (Doc. 98 at 16-19.)  The Government concedes that Hunter's medical conditions are serious but maintains that Hunter has received adequate medical attention for his conditions and that his conditions have largely stabilized. (Doc. 103 at 6-10.)  The Government also argues that the section 3553(a) factors weigh against release.  (Id. at 10-11.)

## II. ANALYSIS

"Federal law has long authorized courts to reduce the sentences of federal prisoners facing extraordinary health conditions," but prior to the passage of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, district courts could grant such reductions only upon a motion by the Director of the Bureau of Prisons ("BOP") pursuant to 18 U.S.C. § 3582(c)(1). United States v. Beck, 425 F. Supp. 3d 573, 577-78 (M.D.N.C. 2019). However, Congress amended section 3582(c)(1) when it passed the First Step Act. Pertinent here, the First Step Act added a provision to section 3582(c)(1) that allows a defendant to bring a motion for compassionate release directly in a district court after either "the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

Once the exhaustion requirement is met, a defendant must either (1) have "extraordinary and compelling reasons" for a compassionate release or (2) be at least 70 years old, have served at least 30 years in prison, and have the Director of the BOP determine that the defendant is not a danger to the public. Id. The defendant bears the burden of establishing that extraordinary and compelling reasons justify his release. See United States v.

4

Newton, 996 F.3d 485, 488 (7th Cir. 2021); see, e.g., United States v. Hargrove, 30 F.4th 189, 195 (4th Cir. 2022). Further, while a court need not address every argument raised by a defendant, it must fully explain its decision in light of the particular circumstances of each case. United States v. Osman, No. 21-7150, 2022 WL 485183, at *2 (4th Cir. Feb. 17, 2022) (per curiam) (unpublished)[1] (citing United States v. High, 997 F.3d 181, 188-89 (4th Cir. 2021)). Additionally, a court, in considering a reduction in sentence pursuant to section 3582(c)(1)(A), must consult the sentencing factors set forth in 18 U.S.C. § 3553(a) and may grant the reduction only if it is "consistent with [the] applicable policy statements" issued by the United States Sentencing Commission. 18 U.S.C. § 3582(c)(1)(A).

Section 3582(c)(1)(A) also requires that a sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(ii). As recently amended, United States Sentencing Guideline section 1B1.13(a) largely reiterates the requirements of section 3582(c)(1)(A), with the additional requirement that a defendant not be "a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(a)(2); see also Beck, 425 F. Supp.

---

[1] Unpublished opinions of the Fourth Circuit are not precedential but can be cited for their persuasive, but not controlling, authority. See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006).

3d at 578.  Section 1B1.13(b) then provides a non-exhaustive list of examples of extraordinary and compelling reasons to grant a compassionate release.  The four enumerated reasons are (1) medical circumstances of the defendant; (2) age of the defendant; (3) family circumstances of the defendant; and (4) defendant as a victim of abuse.  U.S.S.G. § 1B1.13(b).  Section 1B1.13(b)(5) then provides a catch-all for "any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)."  Section 1B1.13(b)(6) also provides that a court may consider a change in the law when determining "whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances."  Finally, section 1B1.13(d) states that rehabilitation of the defendant is not alone an extraordinary and compelling reason, but it may be considered along with other circumstances.

Courts maintain broad discretion in the evidence they may consider on a motion to reduce a sentence under the First Step Act.  Concepcion v. United States, 142 S. Ct. 2389, 2403-04 (2022).  However, courts do not have unfettered jurisdiction or discretion

6

to modify criminal sentences. See United States v. Goodwyn, 596 F.3d 233, 235 (4th Cir. 2010) ("The law closely guards the finality of criminal sentences against judicial change of heart.") (internal quotations omitted). A court may modify a sentence only when a provision in the Federal Rules of Criminal Procedure or a statute, such as 18 U.S.C. § 3582(c), expressly permits it to do so. Even then, section 3582(c) is appropriately invoked only in unusual cases, or, as the Fourth Circuit phrases it, the "most grievous cases." McCoy, 981 F.3d at 287; see Osman v. United States, Crim. No. 2:10-cr-57-5, 2023 WL 3765246, at *4 (E.D. Va. June 1, 2023) ("The Senate Judiciary Committee report on the Sentencing Reform Act explained that compassionate release would address 'unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances.'" (citations omitted)). It is not a vehicle for repeated reconsideration of sentences as a way to circumvent the general rule of finality. See Goodwyn, 596 F.3d at 235-36. Nor is it a vehicle to collaterally attack a federal conviction or sentence. United States v. Ferguson, 55 F.4th 262, 270 (4th Cir. 2022).

The Government concedes that Hunter has "complied with the administrative exhaustion requirement of 18 U.S.C. § 3582(c)(1)(A)." (Doc. 103 at 4 n.1). The court thus turns to the merits.

First, Hunter contends that his sentence is excessive in

7

comparison to what other defendants receive for similar crimes. (Doc. 98 at 16.) Newly amended Sentencing Guideline section 1B1.13(b)(6), allows a court to consider disparities in sentencing, in relevant part, when the defendant receives an unusually long sentence, of which the defendant has served at least 10 years, <u>and</u> there is a change in law that results in a gross disparity between the defendant's sentence and the likely sentence that would be imposed under the change in law. Here, Hunter fails to note any change in law applicable to his situation. His citation to <u>McCoy</u> is inapt, as Hunter was convicted for violation of 18 U.S.C. § 922(g)(1) and not § 924(c)'s stacking provisions. He cites, rather, to sentencing disparities among defendants he argues are similarly-situated. But attacks to the underlying sentence are not cognizable on compassionate release. <u>Ferguson</u>, 55 F.4th at 270. He also contends that others have received the benefit of compassionate release. No doubt some motions for compassionate release have been granted by the courts, but such cases are based on their individual merits and are not a basis for relief. Finally, even were there some new change in law, the new Guidelines requires that the applicant have served at least 10 years before being eligible for relief, which Hunter has not. Therefore, having not identified any change in law, and having not demonstrated any likely "gross disparity" between the sentence imposed and the sentence he would receive if sentenced today,

8

Hunter's claim that a sentencing disparity is a ground for compassionate release is wholly without merit.

Second, Hunter argues that his serious medical conditions are an extraordinary and compelling reason for compassionate release. (Doc. 98 at 17.) These conditions include aortic type B dissection, hypertension, acute kidney injury, stage III kidney disease, and prostate enlargement. Hunter also argues that his conditions make him particularly susceptible to severe illness should he contract COVID-19. (Id. at 18.)

In relevant part, U.S.S.G. § 1B1.13(b)(1) provides that an extraordinary and compelling reason exists when the defendant is suffering from (1) a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory); (2) a serious medical condition that substantially diminishes the ability of the defendant to provide self-care while incarcerated; or (3) a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death. U.S.S.G. §§ 1B1.13(b)(1)(A)-(C). An extraordinary and compelling reason may also exist where the defendant is housed at a correctional facility affected by an ongoing outbreak of infectious disease, the defendant is at increased risk due to personal health factors, and such risk cannot be adequately mitigated in a timely manner. U.S.S.G. § 1B1.13(b)(1)(D).

9

To be sure, Hunter's conditions are serious, but they are not terminal illnesses. Compared to the Guidelines' examples — metastatic solid-tumor cancer, ALS, end-stage organ disease, and advanced dementia — Hunter's conditions are presently stable and managed. See U.S.S.G. § 1B1.13(b)(1)(A); (see also Doc. 98 at 17 (Hunter describing conditions as life-altering and "possibly" terminal); Doc. 85 at 7 (analyzing lesser risk of Type B aortic dissection compared to Type A)); Cleveland Clinic, Chronic Kidney Disease, at https://my.clevelandclinic.org/health/diseases/15096-chronic-kidney-disease (describing stage III (out of V) as the "most common stage" and one where "many people can stay . . . and never advance to stage 4"). The court has previously addressed Hunter's medical conditions at great length (Doc. 68 at 4-5; Doc. 85 at 6-14; Doc. 109 (analyzing mental condition under equitable tolling doctrine)), and a careful review of his current medical records does not show any material change from the court's last review.

In addition, Hunter has not demonstrated that he is unable to provide self-care while incarcerated because of his serious medical conditions. Unlike in United States v. Maxwell, 537 F. Supp. 3d 824, 832 (S.D. Ohio 2021), where the defendant suffered from an array of serious medical conditions that rendered him "completely unable to care for himself," Hunter remains at least partially ambulatory and has not shown the inability to carry out

10

everyday self-care. (See Doc. 98 at 24 (explaining weakened legs resulting in spending "great degree of time either in bed or in a sitting position").)

While Hunter's conditions require specialized care, the record reflects that Hunter has received the care he needs for his serious conditions. He argues that his condition "has been exacerbated by gaps in medical treatment at FCI Terre Haute." (Doc. 98 at 4.) But his medical records do not support this claim. (See Doc. 104 at 124-25, 128, 143, 150; Doc. 104-1 at 13-14 (reports of visits with specialists).) His Type B aortic dissection is less likely to result in catastrophic injury and tends to be more treatable than a Type A dissection. (Doc. 85 at 7.) As of his last visit, the dissection remained unchanged from his previous 6-month appointment. (Doc. 104 at 128.) At an April 2023 appointment, the doctor remarked that his blood pressure readings were "very good" and his hypertension is "well controlled with multiple medications and good compliance." (Doc. 104-1 at 14.) His renal function is being monitored regularly. (Id. at 1-2.) Altogether, Hunter is being monitored by a cardiovascular surgeon, a urologist, and a nephrologist, and his follow-ups for his Type B dissection are timely scheduled (now every 12 months, having been monitored every 6 months for some time).

As for Hunter's risk of COVID-19, FCI Terre Haute, where Hunter is currently housed, reports one active COVID-19 infection.

See Fed. Bureau of Prisons, Inmate COVID-19 Data, at https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp (last accessed Nov. 15, 2023). As the court has previously noted, Hunter does appear to be at increased risk of serious COVID-19-related disease due to his medical conditions, but there is no "ongoing outbreak of infectious disease" at the facility or an "ongoing public health emergency." See Ctrs. for Disease Control and Prevention, End of the Federal COVID-19 Public Health Emergency (PHE) Declaration, at https://www.cdc.gov/coronavirus/2019-ncov/your-health/end-of-phe.html ("May 11, 2023, marks the end of the federal COVID-19 PHE declaration."). And while Hunter refused a booster in January 2023, records reflect that he received a Janssen COVID-19 vaccine in September 2021. (Doc. 104-2.) In sum, even considering Hunter's comorbidities, the court finds his vaccination status and the reduced threat of infection mitigates his risk of serious disease to such a degree that COVID-19 is not an extraordinary and compelling reason warranting his release.

Finally, Hunter contends that he has taken rehabilitative steps that, in combination with his medical conditions, warrant compassionate release. For example, his amended filing indicates that he has enrolled in a GED program and has passed the social studies and science tests with good scores. (Doc. 107.) His efforts are commendable. While rehabilitative steps "may be considered in combination with other circumstances," the

12

Sentencing Guidelines state that "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason." U.S.S.G. § 1B1.13(d). As such, Hunter has not demonstrated that his rehabilitative steps, alone or in combination with other circumstances, present an extraordinary and compelling reason for compassionate release.

Even if extraordinary and compelling reasons existed, early release would not be appropriate in this case in light of the section 3553(a) factors.

Section 3553(a) requires a court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the statutory purposes of sentencing. 18 U.S.C. § 3553(a). Importantly, the "text of § 3553(a) does not make any factor, or combination of factors, dispositive." Kibble, 992 F.3d at 334-35 (Gregory, C.J., concurring). Thus, the court must consider —

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or

13

other correctional treatment in the most effective manner;

    (3) the kinds of sentences available;

    (4) the kinds of sentence[s] and the sentencing range established for [the applicable offense category as set forth in the guidelines] . . .;

    (5) any pertinent policy statement . . . by the Sentencing Commission . . .;

    (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

    (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). Just as the court found on Hunter's first motion for compassionate release, these factors continue to weigh against his release:

> Hunter's underlying offense in this case -- trading illegal drugs for illegal firearms -- required no strenuous exertion of energy on his part. (Doc. 31 at ¶¶ 15, 18-20.) The buyer of the narcotics had placed a gun outside his home and called Hunter to pick it up. (Id. at ¶ 15.) The following morning, Hunter phoned the buyer, informed him he had retrieved the firearm, and left $60 in cocaine base by a tree where the firearm was placed. (Id.) Moreover, Hunter's supplier knew him for years as a result of Hunter's drug trafficking, which also requires no heavy lifting or exertion. (Id. at ¶ 6.) No aspect of this crime required strenuous physical activity which could now be impacted by Hunter's aortic dissection.
>
> A review of Hunter's criminal history reflects additional crimes which would not be inhibited, at least physically, by his current medical condition. While Hunter was 31 years old at sentencing, his criminal history dates back to age 18 and includes two convictions for felony possession of cocaine with intent to distribute (sentenced to 8-10 months and 15-18 months,

14

consecutive on revocation; 13-25 months sentence), a conviction for hit and run failure to stop for damaged property, assault on a female for hitting her in the side of the head and spraying air freshener in her eyes, child abuse for striking a child in the face, and two additional convictions of felony possession of cocaine with intent to distribute and felony conspiracy to sell cocaine. (Id. at ¶¶ 47-59.) None of these criminal acts required any more physical exertion than that which Hunter has applied exercising while incarcerated. If Hunter can engage in light exercise (indeed his doctors encourage it (Doc. 79-13)), as well as jog and do burpees, he is not precluded from engaging in relatively passive crimes such as distributing drugs, engaging in illegal firearm transactions, or striking someone once in the face and spraying air freshener in their eyes. At best, some of Hunter's prior criminal activity, such as assault on a government official for striking police officers and ripping their clothing, or his separate assault on a female for assaulting a woman "by ripping her clothing off, dragging her through a yard, and scratching her face," might be impacted by his current condition. (Id. at ¶¶ 56- 57.) However, many of his prior criminal activities, including the offense of conviction, could easily be committed even with an aortic dissection.

The same is true for Hunter's infractions while incarcerated. He has received at least four disciplinary sanctions for serious violations including phone abuse, introduction of drugs or alcohol into the prison, threatening bodily harm, and fighting with other inmates. (Doc. 65-6.) While one can argue that his ability to fight with other inmates may be impacted by his health conditions, Hunter's other infractions could still be committed by someone with an ailment as serious as an aortic dissection. The fact that Hunter has attempted to introduce synthetic drugs into the prison as recently as October 2019 indicates that he maintains some willingness to participate in drug transactions. (Id.) His aortic dissection, while serious, does not complicate his ability to engage in illegal drug transactions to the extent that he no longer poses a danger to the public. As such, the court determines that, although Hunter's extensive criminal history and his infractions while incarcerated occurred prior to his aortic dissection, his current physical ability is

15

sufficient to enable him to engage in dangerous criminal
conduct.

    Furthermore, releasing Hunter after serving only
half[2] of his sentence would insufficiently recognize the
seriousness of his offense conduct. Hunter's
presence report details at length how Hunter rode
around trading narcotics for stolen firearms. (Doc. 31
at ¶¶ 10-15.) In addition to the AR-15 Hunter possessed
when arrested, despite being a convicted felon at the
time, the presentence report lists seven other firearms
connected to him, including one which was used at a
shooting at a Charlotte mall. (<u>Id.</u> at ¶ 15 & n. 3.) It
is precisely this kind of conduct that puts firearms
into the hands of prohibited criminals and makes society
more dangerous.

    What the court is left with, then, is surmising
that now that Hunter has a potentially serious medical
condition ahead of him, he has committed to abandoning
his criminal ways sufficiently to reduce any risk to the
community. While one would hope so, the record does not
support that conclusion. Indeed, as recently as April
14, 2022, Hunter became abusive, disruptive, and
threatening with his treating physicians to the point
that it not only interfered with the treating
physician's ability to conduct a clinical interview but
caused the doctor to find it "concerning for the security
risks" it posed to him. (Doc. 82 at 1, 4.) This court
in its discretion concludes that Hunter has not
demonstrated that the 3553(a) factors tilt in his favor.

(Doc. 85 at 18-22.)

Having determined that Hunter has not demonstrated a change material to the sentencing factors since the court denied his prior motion for compassionate release approximately 18 months ago, the court finds that the section 3553(a) factors continue to weigh heavily against early release. In particular, as the court found

---

[2] Hunter has now served just over 60 percent of his sentence.

in its last decision denying compassionate release, Hunter's aortic dissection, while serious, does not reduce his ability to engage in criminal conduct to the extent that he no longer poses a danger to the public. Granting Hunter's motion for compassionate release at this time, moreover, would fail to adequately reflect the seriousness of the offense of conviction, his criminal history, and his conduct during incarceration.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Hunter's motion to amend (Doc. 107) is GRANTED.

IT IS FURTHER ORDERED that Hunter's motion for compassionate release (Doc. 98) is DENIED.

/s/    Thomas D. Schroeder
United States District Judge

November 16, 2023